JOHN H. PIERCE

*v.*

OLD DOMINION COPPER MINING AND SMELTING COMPANY et al.

[Filed May 28th, 1904.]

1. A summary proceeding under section 65 of the Corporation act (*P. L. of 1896 p. 298*), authorizing an injunction to prevent an insolvent corporation from exercising its franchises, amounts to a final hearing in the case. Such a proceeding is *in rem* and fixes the *status* of the corporation in respect to the exercise of its franchises.

2. A receiver for an insolvent corporation cannot be appointed, under section 66 of the Corporation act (*P. L. of 1896 p. 298*), before the order for an injunction preventing the corporation from exercising its franchises.

3. A bill against a corporation seeking an injunction and receiver on the ground of insolvency under the Corporation act, and also embracing a distinct action based upon the general equity jurisdiction of the court against the same alleged insolvent corporation and other defendants, is multifarious.

4. Upon such a bill the court will not permit the complainant at the same time and on the same proofs to bring on the final hearing of the statutory action against the corporation alleged to be insolvent, and an interlocutory motion for an injunction or receiver in the other action under the general equity jurisdiction of the court.

5. An injunction forbidding certain corporations to enter into an amalgamation agreement whereby the property of one was to be taken by the issuance of stock in the other, does not affect the right of the stockholders of such corporations to negotiate an agreement to accomplish the same end 'without issuing stock illegally.

6. An injunction will not issue to prevent two corporations from entering into a contract on the sole ground that a minority of the directors of one of the contracting corporations owns stock in a third corporation which owns stock in the other contracting corporation.

7. The court will not prevent two corporations having friendly relations (a third corporation holding a majority of the stock of each of them) from contracting with each other until it appears that the proposed contract is inequitable or unfair.

On order to show cause why an injunction should not issue

and a receiver be appointed of the assets of the defendant corporation the Old Dominion Copper Mining and Smelting Company.

*Mr. Edward M. Colie,* for the complainant.

*Mr. Brundeis* (of the Massachusetts bar) and *Mr. William H. Corbin,* for the defendants.

STEVENSON, V. C.

The complainant is a stockholder of the defendant corporation the Old Dominion Copper Mining and Smelting Company, holding $25,000 par value of stock.

The defendants are the Old Dominion Copper Mining and Smelting Company, a corporation under the laws of New Jersey; the United Globe Mines, a corporation under the laws of New York; the Old Dominion Company of Maine, a corporation under the laws of Maine, and twelve natural persons, who include the directors of the above-named three corporations, or the most of them.

The bill alleges that the defendant corporation the Old Dominion Copper Mining and Smelting Company is insolvent, and undertakes to make the necessary statement of facts from which insolvency to the extent and of the character defined by our statute in relation to insolvent corporations may be inferred.

The bill also undertakes to set forth a complete equitable cause of action against the Old Dominion Company of Maine, the United Globe Mines, the directors of the Old Dominion Copper Mining and Smelting Company and the directors of the other two corporations, based on allegations of fraud or other misconduct affecting the management of the Old Dominion Copper Mining and Smelting Company, and the complainant as a stockholder of said company. The bill, in this aspect, undertakes to exhibit a familiar type of an equity suit under the general jurisdiction of the court wholly unconnected with any statute.

The bill, after praying for injunctive and other relief of

various kinds against various defendants, prays that "a receiver may be appointed of the Old Dominion Copper Mining and Smelting Company, either under the statute in such case made and provided, and the corporation be declared insolvent, or a receiver be appointed of the property of said corporation under the general equity powers of this court, and that if *need be* the said Old Dominion Copper Mining and Smelting Company may be enjoined from exercising any of its franchises and from receiving any debts due to it, and from paying or transferring any of its moneys or effects, and from continuing its business." Then follows the usual general prayer for relief. The answer is prayed for without oath.

On filing the bill, an order was made requiring all the defendants to show cause "why an injunction or injunctions should not issue pursuant to the prayers of said bill, and why a receiver should not be appointed for the Old Dominion Copper Mining and Smelting Company, pursuant to the prayers of said bill, *under the general equity powers of this court, or under the statute in such case made and provided,* to take charge of all the property, estate, books, papers, &c., of the said Old Dominion Copper Mining and Smelting Company."

While the sufficiency of the allegations of the bill to invoke the statutory jurisdiction of the court of chancery conferred by section 65 of our present Corporation act may be questioned, the intention of the bill and order to show cause, plainly, is to present to the court the equitable action created by this statute, joined with the other entirely distinct equitable action above mentioned.

Upon the hearing under the order to show cause, the Old Dominion Copper Mining and Smelting Company appeared and presented an answer, and the defendant J. Waldo Smith, one of the directors of the Old Dominion Copper Mining and Smelting Company, also appeared.

The Old Dominion Copper Mining and Smelting Company, by its answer, denies that it is insolvent, and also denies practically all the charges of misconduct set forth in the bill and accompanying affidavits against it or against its directors. Very

many of the facts, however, set forth in the bill on which the complainant bases his claim for injunctive relief are admitted by the answer, so that a large part of the argument of this cause has dealt with the rights asserted by the complainant and the remedies prayed for by him growing out of a situation about which there is little, if any, dispute.

The answer of the Old Dominion Copper Mining and Smelting Company does not object to the bill as multifarious or as improperly joining two inconsistent or incongruous equitable actions which cannot be conveniently tried together. Upon the argument, however, I intimated to counsel for the complainant that the court ought not to entertain such an alternative application as is described in the order to show cause, based upon the two distinct causes of action set forth in the bill, and that the complainant ought to elect whether to proceed with the summary final hearing under the statute in relation to insolvent corporations or with a mere interlocutory motion made in a suit under the general equity jurisdiction of the court.

The following are the two radically different proceedings which the complainant undertakes to conduct upon the order to show cause made in this case, viz.:

1. An ordinary motion for a preliminary injunction in a suit brought by the complainant against three corporations and their respective directors under the general equity jurisdiction of the court, the object of the injunction being to protect one of these defendant corporations and the complainant as a stockholder thereof.

2. A summary final hearing in an action under our statute in relation to insolvent corporations brought against one of these defendant corporations, the object being to obtain what is practically a dissolution of the corporation and an administration of its assets.

In other words, in order to pass upon the alternative applications of the complainant, it must be considered that this court, at the same time and upon the same pleadings and affidavits, has given a final hearing to the complainant's statutory cause of action against the Old Dominion Copper Mining and Smelt-

ing Company, and has entertained a motion for a preliminary injunction, a mere interlocutory proceeding, in the complainant's action against the Old Dominion Copper Mining and Smelting Company and all these other defendants. The two proceedings are entirely different in their nature, and in one of them, the statutory action based on insolvency against the defendant the Old Dominion Copper Mining and Smelting Company, some of the other defendants have no concern. One proceeding has in view the preservation of the corporate existence and corporate property of the Old Dominion Copper Mining and Smelting Company, and the prevention of injuries inflicted or threatened to be inflicted upon this corporation and its property by the other defendants; the other proceeding is aimed directly at what is practically the corporate life of the Old Dominion Copper Mining and Smelting Company, and seeks to suspend, and then possibly to destroy, the life of that corporation—terminate its corporate existence—and distribute its assets among its creditors and stockholders as the estates of deceased persons are disposed of. In my judgment, the joinder of two such different and in many respects inconsistent remedial proceedings is not convenient, but tends to great embarrassment and confusion in our practice, and ought not to be tolerated.

At present I am not obliged to pass upon the question, if there is such a question, whether this bill of complaint is multifarious or presents a case of misjoinder of two incongruous causes of action. The sole question now to be discussed is whether upon such an order to show cause as was made in this case a summary final hearing under our act in relation to insolvent corporations ought properly to be held concurrently with a motion for an interlocutory order for a preliminary injunction, each proceeding being based upon a different aspect of the same bill of complaint. The answer to this question involves a consideration of the exact nature of our statutory equitable action against an insolvent corporation and of the proceeding therein which is usually had upon an order to show cause. In the case of *Gallagher* v. *Asphalt Company of America, 65 N. J. Eq. (20 Dick.)*

*258,* I had occasion to discuss this subject in some of its aspects, but some further examination of the matter may be of use.

Sections 65 and 66 of our present Corporation act, which confer upon the court of chancery its jurisdiction over insolvent corporations, have come down practically unchanged through various revisions from their origin in the act of 1829 entitled "An act to prevent fraud by incorporated companies." *P. L. of 1829 p. 58.* The language of the statute, which I think has been justly criticised, was largely borrowed from a statute of the State of New York passed in 1825, after which statute it was undoubtedly modeled. *N. Y. Sess. L. 1825 p. 448.*

The provisions of this New York statute of 1825 were incorporated in the revised statutes of the State of New York of 1829. *2 Rev. Stat. N. Y. pp. 463, 464 §§ 39, 40, 41.*

The New York system thus established provided that a creditor's suit against a corporation in aid of execution should be for the benefit of all the creditors. *2 Rev. Stat. N. Y. p. 463 §§ 36, 37.* Insolvency of any incorporated company continued for a year, or suspension of its business for a year, constituted a surrender of the corporate franchises and subjected the corporation to a dissolution. In such case, however, the proceeding to secure a dissolution of the corporation was brought by the attorney-general and was commenced by an information in the nature of a *quo warranto*—an action at law. *2 Rev. Stat. N. Y. p. 583 § 39.* If judgment in this *quo warranto* action passed in favor of the state the assets of the corporation were reached by a suit in chancery, and it was made the duty of the attorney-general to institute such suit in all cases where judgment of ouster went against a corporation in the supreme court of the state. *2 Rev. Stat. N. Y. p. 585 § 51.*

In the case, however, of an insolvent corporation having banking powers, an equitable action was provided by the statute of 1825, above mentioned, and by the revised statutes of 1829 (*2 Rev. Stat. N. Y. p. 463 § 39*) which could be instituted by the attorney-general of the state or by any creditor of the corporation and which in all essentials is precisely the same sort of a statutory action as that which was created by our New Jersey

statute of 1829—sections 65 and 66 of our present Corporation act. This special equitable action against insolvent banks involves an injunction restraining the corporation "from exercising any of its corporate rights, privileges or franchises" and from receiving or transferring any of its moneys or assets, and includes a receivership as well.

It may be noted in passing that in 1844 Chancellor Walworth held that under the provisions of the New York revised statutes of 1829 a creditor of an insolvent business corporation, which has suspended its business for one year, might maintain an action in equity to have the dissolution of the corporation "judicially declared and its concerns wound up under the direction of the court." *Mickles* v. *Rochester City Bank, 11 Paige 118, 126.*

The framers of our New Jersey statute of 1829 preferred to extend widely the scope of this equitable *quo warranto* action, which the New York legislation confined within very narrow limits. All New Jersey corporations, with a very few exceptions, were subjected to this equitable statutory action. *P. L. of 1829 p. 59 § 6; p. 64 § 21.* Any stockholder, as well as any creditor, could institute the action. The policy of the New Jersey law was to bring about this result: That when a business corporation of any kind becomes insolvent—hopelessly insolvent; insolvent to such an extent that it cannot continue its business with advantage to the stockholders and safety to the public—it should be stripped of its franchises, and its property should be distributed by a single equitable action instead of through the instrumentality of a cumbersome double procedure, first in law and then in equity.

Ordinarily, when the situation above described existed in New York, the remedy on behalf of creditors appears to have been, first, to endeavor to get preferential liens upon the leviable assets of the corporation through executions at law, and after that to divide up, *pro rata,* the assets which could only be reached through a creditor's suit in equity.

How widely our statutory proceeding differs from a mere creditor's suit to collect money was indicated over fifty years

ago by Chancellor Benjamin Williamson, in one of the earliest cases which dealt with the nature of the remedy provided by our statute. *Rawnsley* v. *Trenton Mutual Life Insurance Co., 9 N. J. Eq. (1 Stock.) 95 (1852)*. The chancellor says (at *p. 96*): "Where a creditor or stockholder comes into court under this act, it is not his particular grievance the court is to redress or his individual interest that is to be protected, but the very object of the act is to protect the *public at large* from imposition, and to promote and secure the general interest of the stockholders and creditors."

This statement clearly shows that beyond the collection of overdue debts our statutory action is aimed to secure those objects which are ordinarily attained by a *quo warranto* action in a common law court. The reference in the statute to the "safety of the public" points in the same direction.

The title of the statute indicates beyond question that the legislative intent was not to provide a ready means for the collection of debts from insolvent corporations, but "to prevent *fraud*" by insolvent corporations. Substantially all the provisions of the act of 1829 are directly aimed at the prevention of fraud. The fraud on the part of incorporated companies which the new equitable action was intended to *prevent* consisted not only in preferring existing creditors, but also in contracting new obligations with persons who would be ignorant of the fact that the corporation was insolvent. The means adopted for the *prevention* of fraud by insolvent corporations was the action *in rem* which resulted in a decree disabling the corporation from exercising its franchises.

It is true that the actor in our statutory proceeding is not the attorney-general of the state, as was the case originally under the provisions of the New York statute of 1825; any stockholder or any creditor may appear as the actor. But I think a careful consideration of the history of this action, and the one single necessary object of it, leads to the conclusion that the particular stockholder or creditor who appears as actor is not presenting his particular grievance, as Chancellor Williamson said, long ago; he is merely acting as the representative of

all the stockholders and all the creditors, and also as the representative of the public interest, discharging, in effect, a public function, such as usually is committed to the attorney-general of the state. Chancellor Vroom, in the case of *Mechanics' Bank of Philadelphia* v. *Bank of New Brunswick, 3 N. J. Eq. (2 Gr.) 437, 440 (1836)*, says that the suit under the statute "is for the benefit of the complainants, not only but all other applying creditors. They constitute one party."

The legislative theory seems to have been in accordance with that which has often been acted upon—a private individual is permitted to institute a punitive proceeding and his interest in the result is relied on to secure enforcement of the law for the public benefit. An attorney-general might be remiss in the discharge of the duty, but a stockholder or a creditor, whose property was being affected, would naturally be quick to set in motion the machinery of the statute, the direct object of which is to prevent fraud upon the public and the indirect result of which is to distribute the assets of the corporation among its creditors and stockholders. That the statutory action is not a creditor's suit seems to be indicated very strongly by the fact that a stockholder can institute it. That the statutory action is not a stockholder's suit is indicated with equal plainness, because a creditor may institute it. The object of the statutory action certainly cannot be one thing in case it is instituted by a stockholder and another thing in case it is instituted by a creditor. Whether the statutory action to secure a practical forfeiture of the right of a corporation to exercise its franchises is instituted by a stockholder of the corporation, or a creditor of the corporation, or by the attorney-general of the state, it seems to me that the essential nature and object of the action are the same.

Chancellor Walworth, six years after the New York statute, which was the model of our New Jersey statute, was enacted, held that the effect of it was to give to the stockholder the power to maintain an action "to enforce forfeiture of the franchises of the corporation." *Verplanck* v. *Mercantile Insurance Co., 2 Paige 437, 451.*

It has often been said that our statutory action is in the nature

of a suit *in rem*. This description is correct, because the decree fixes the *status* of the corporation with respect to the exercise of its franchises as against the whole world. *Albert* v. *Clarendon Land, &c., Co., 53 N. J. Eq. (8 Dick.) 625.* The particular stockholder or creditor who institutes our statutory action does not, as Chancellor Williamson said, come into court for the redress of his particular grievance; he acts as the representative of all the stockholders and creditors. It is well settled that when the decree has passed, disabling the corporation and establishing the conditions under which a distribution of assets will follow through a receiver, if there are any assets, the power of the particular stockholder or creditor who instituted the proceedings to control the decree is gone.

This statutory action, as in suits brought by a creditor on behalf of himself and other creditors who may come into the suit, prior to decree, undoubtedly has so far the character of all actions, strictly *inter partes,* that the creditor instituting the action may discontinue it at any time provided no other creditor has been allowed to intervene. *Thompson* v. *Fisler, 33 N. J. Eq. (6 Stew.) 480; 1 Dan. Ch. Pr. 235, 236; Bissell* v. *Besson, 47 N. J. Eq. (2 Dick.) 580, 584.* "Such absolute dominion over the suit cannot be exercised by the original complainant alone if there be other complainants." *Thompson* v. *Fisler, supra.* It has been the constant practice to admit stockholders and creditors as parties complainant in our statutory action prior to decree, and I know of no case where their *right* to intervene has been contested by the original complainant. There are strong grounds, I think, for holding that, subject to the control of the court, every creditor or stockholder has a right as against the original complainant to have the practical *status* accorded to him on his own petition of a party complainant in the cause. When a suit has been commenced against an insolvent corporation under our statute there certainly seems room to doubt whether the complainant in that suit ought to have the arbitrary power at all times prior to the decree to exclude from the suit all of his co-beneficiaries who, eventually, if the case goes to decree, will be practically brought into the suit by notice. There also seems

room to doubt whether other creditors besides the particular one who institutes the suit must be compelled to file independent bills and procure independent temporary injunctions in order to avoid the loss which may fall upon them by reason of a discontinuance of the suit first brought upon settlement between the parties of record thereto.

The framers of our statute intentionally combined the action at law and the subsequent action in equity which the New York statutory system kept distinct in the great majority of corporation insolvencies, and combined them in that court which could most efficiently do the entire work required to be done.

Whatever may have been the exact views of the chancellors and judges of the state who first enforced the provisions of the act to prevent fraud by incorporated companies, our present practice treats the summary hearing upon the order to show cause as a final hearing for the determination of all the issues in the cause, and the decree thereon disabling the defendant corporation from exercising its franchises, usually called a decree of insolvency, as a final decree.

A very little consideration of the nature and scope of the hearing which is had on an order to show cause why a decree should not be made, based on a finding of insolvency, permanently enjoining a corporation from exercising its franchises and providing for the distribution of its assets among its creditors and stockholders by a receiver, will show that the more or less vague idea which has prevailed to a certain extent that the proceeding is a mere motion for an interlocutory injunction is erroneous, and that what in fact is done is to conduct a final hearing of a cause and make a final decree therein.

The action is commenced either by bill or by petition. No process ever need be issued and no process in case the proceedings are begun by petition is prescribed by the statute. The court gains jurisdiction by the giving of "reasonable notice" to the defendant corporation. Upon service of such reasonable notice on the return day of the order to show cause, the corporation is as much under the jurisdiction of the court as if a subpœna or a summons had been served upon it by a sheriff or

other public officer.  Every state has the power to prescribe the reasonable notice which shall be given in order to subject defendants to the jurisdiction of its courts and it is of no consequence what the form of such notice may be.  *Mackay* v. *Gordon, 34 N. J. Law (5 Vr.) 286, 291; Hervey* v. *Hervey, 56 N. J. Eq. (11 Dick.) 424, 426.*

On the return day of the order to show cause the statute prescribes a "summary" hearing of the "affidavits, proofs and allegations which may be offered on behalf of the parties." Under our modern practice in the vice-chancellors' courts, this summary hearing often is, and always will be, where justice so requires, a complete trial of the issues presented by the pleadings.   The defendant corporation may present an answer or only affidavits, or may, without answer or affidavits, contest the charges contained in the complainant's petition or bill.   Under the old practice, where the proofs in equitable actions were in the form of depositions, the very sharp distinction between an interlocutory motion for a receiver in an ordinary equity suit and this summary final hearing in our statutory action, would naturally not be so perceptible as it is at the present time.

If upon the summary hearing (the witnesses on both sides, for instance, being sworn in open court, and the proceeding being indistinguishable from an ordinary final hearing) the decree goes that the corporation be enjoined from exercising its franchises, the proceeding as a suit *inter partes* is ended, and what follows is the administration of a trust under the direction of the court.  This trust arises from the situation created by the injunction which disables the corporation from exercising its franchises and taking care of its property.

After the summary final hearing no process of subpœna is issued or ought to be issued.  The entire function of process has been performed by service of the statutory notice under the direction of the court.  Whether the corporation has submitted an answer upon the summary hearing, or only offered affidavits, or has without answer or affidavits appeared and contested the complainant's case, or has made default, no other subsequent final hearing can be had.  Long before any subse-

quent final hearing could be brought on, under the practice of the court, the entire assets of the insolvent corporation might be converted into cash and distributed, and under a comparatively recent statute the corporation itself might be dissolved by an order of the court made in the cause or proceeding. The opportunity for the defendant corporation to file an answer and to litigate the whole cause of action set forth in the bill or petition is on the return day of the order to show cause—at the time appointed for the summary final hearing. Both parties on this hearing, under our settled practice, are allowed an ample opportunity to present proofs. No surprise is tolerated. The hearing, frequently, may be continued in order that the whole case may be fully and fairly tried. The limitations upon the use of affidavits, under our ancient practice, and particularly under rule 122, on the argument of motions for an injunction or motions to dissolve an injunction, are not applicable to this summary hearing under our statute. Before these summary hearings became to so large an extent practically confined to the vice-chancellors' courts, the chancellor frequently made an order for the taking of depositions before a master on notice, subject to the right of cross-examination, and adjourned the hearing until the depositions so taken could be presented. At present this course is sometimes taken in the vice-chancellors' courts, but frequently the whole cause is tried upon oral testimony, precisely like any other equity cause on final hearing. If, as the result of this summary final hearing, the complainant or petitioner fails to sustain his case, the action of the court is not a mere order denying a motion and vacating an order to show cause, leaving the suit still pending, but a final decree dismissing the petition or bill. After the defendant corporation has been brought into court by service of the statutory notice, has presented its answer or its answering affidavits, and both parties have had an ample opportunity to present their proofs, oral and written, and then the court has decided that the proofs fail to sustain the complainant's case—fail to show that the defendant is insolvent to the extent defined by the statute, and that therefore no injunction should be issued or receiver be appointed—

the complaining creditor or stockholder cannot continue to prosecute his suit and bring on a further subsequent final hearing, upon which his cause will be tried over a second time and the defendant be subjected to a second defence.

On the other hand, if upon this summary hearing the defendant, having a full opportunity to present its answer and proofs, has failed to meet the case of the complainant and has been disabled from exercising its franchises by an injunction and thereupon has lost title to all its assets by transfer thereof to a receiver, it cannot file an answer, if it has not already done so, and proceed through, perhaps, six months or a year to litigate the complainant's cause as a pending suit in the manner prescribed for all causes prosecuted under the general equity jurisdiction of the court. If such be the case it would be necessary to delay distribution of the assets until the end of the cause. It would seem also that a similar delay would have to be made in the entry of any order dissolving the corporation.

Whatever may be the finding of the court upon the summary hearing, the matter which is then contested by the parties, the *status* of the corporation becomes *res adjudicata* by whatever decree or order the court may make. Both parties to the litigation have their day in court—their ample opportunity to present pleadings and proofs to sustain their respective contentions.

If either is dissatisfied with the decision of the court the remedy is an appeal to the court of errors and appeals. The litigation in this court over the cause of action set forth in the petition or bill is ended.

If the action of the court of chancery on this summary hearing is only an interlocutory order and not a final decree in the cause, disposing finally of the statutory cause of action set forth in the petition or bill, when, it may be asked, is such a final decree ever rendered under our present practice? If the corporation does not appear, or appears but files no answer, it is not the practice to take a decree *pro confesso* and then take proofs *ex parte* and bring on the cause for a final decree. If, however, a final decree is not reached upon the summary hearing such proceeding would seem to be proper and even necessary.

Upon filing the bill or petition a preliminary order of injunction, restraining the defendant corporation from transferring its assets, is generally made. Originally a preliminary writ of injunction was issued. Such preliminary restraint, however, does not disable the corporation permanently from exercising its franchises. The earlier cases, it is true, indicate that the practice was to issue a writ of injunction "according to the prayer of the bill," which would include restraint upon the exercise of the corporate franchises; but this preliminary injunction was limited in its operation in cases where an interruption of the business of the corporation pending the hearing on the return of the order to show cause might be injurious. It was only upon the summary hearing, after notice to the defendant corporation, that the "full injunction," *i. e.,* the complete statutory injunction permanently disabling the corporation from exercising its franchises, was allowed to go. *Parsons* v. *Monroe Manufacturing Co., 4 N. J. Eq. (3 Gr.) 187, 192, 202 (1842)* ; *Brundred* v. *Paterson Machine Co., 4 N. J. Eq. (3 Gr.) 294, 299, 309.*

The power of the court of chancery under this statute, if such power exists, to strip a defendant corporation of the right to exercise its franchises, to condemn it and suspend its life, if not put it practically to death, before giving it a hearing, has never, so far as I am aware, been exercised.

Immediately upon filing the bill also a receiver of the corporate assets may be appointed in a proper case without notice to the defendant corporation, but unless the defendant corporation has appeared and the "summary hearing" has thereupon been held and the statutory injunction has been ordered, such a receiver is a mere custodian, takes no title under the statute, is appointed under the general equity power of the court which always appertains to the court whether exercising its ancient jurisdiction or some special and novel jurisdiction conferred by statute. One reason why novel statutory equitable actions are created is because the court of chancery is equipped with these special instruments, such as injunctions and receiverships, for the preservation of property and the accomplishment of justice.

The language of our statute which prescribes the appointment of a receiver for an insolvent corporation has remained unchanged since its original enactment in 1829. The power of the court can only be exercised "at the time of ordering the said injunction or at any other time afterwards." No statutory receiver can be appointed unless the statutory injunction, which is the object of the suit, is also ordered or has been already ordered. It is perfectly plain that a mere restraining order or a preliminary writ of injunction, "limited" in its operation, is not a sufficient basis for the making of an order appointing the *statutory* receiver. *P. L. of 1829 p. 60 § 8; Corporation act § 66.*

Before leaving the consideration of the essential nature of our statutory equitable action against an insolvent corporation, it is important to observe that the almost uniform practice has been to make the corporation the sole defendant in the suit.

In some reported instances, another defendant has been joined with the alleged insolvent corporation without objection. *American Ice Machine Co.* v. *Paterson Steam, &c., Co., 22 N. J. Eq. (7 C. E. Gr.) 72; Goodheart* v. *Raritan Mining Co., 8 N. J. Eq. (4 Halst.) 73.* In these cases, however, and in others not reported, where such joinder has occurred, the additional defendant has been brought in, I think, uniformly, merely because some injunction was prayed for against him in aid of the forfeiture proceedings against the defendant corporation. How far, in this statutory action against an insolvent corporation, it is permissible to make other parties than the corporation defendants in order to aid the effectual prosecution of the action against the corporation, perhaps may not be entirely settled. I think, however, that there is no case—certainly not one which would now be regarded as an authority—where this court has entertained in one bill the statutory action in the nature of a *quo warranto* against an insolvent corporation and a distinct action based upon the general equity jurisdiction of the court against this same alleged insolvent corporation and numerous other defendants who are made parties to the bill. It could hardly be contended that such a joinder is possible where the

statutory action is instituted by a petition and not by a bill.
Our statutory action, as we have seen, is an action *in rem,* and
results in fixing the *status* of the corporation in respect of the
exercise of its franchises.   There seems to be no more room for
a second or a third defendant than there is in an action to have
a person or corporation adjudged an involuntary bankrupt, or
in an information in the nature of a *quo warranto* to have
judgment of ouster against a corporation in a court of law.   Of
course, if our statutory action could be properly regarded merely
as a creditor's suit to sequestrate and distribute the assets of
a corporation, such as is provided for by the Delaware statute
and the provisions of the revised statutes of New York above
referred to, or could be deemed similar in nature to the equitable
action in this court to reach unpaid stock subscriptions (*Welh-
erbee* v. *Baker, 35 N. J. Eq. (8 Stew.) 501*), the joinder of other
parties as defendants with the corporation defendant would
present a very different aspect.

I shall not undertake to examine all the reported decisions
in order to see whether there is any authority in conflict with
the views of the nature of our statutory action against an in-
solvent corporation which I have herein expressed.

As I have intimated, the older reported cases may sometimes
mislead, because under the former practice of this court the
summary hearing provided by the statute might in form be the
same proceeding as a motion for an injunction, or a motion to
dissolve an injunction.   Oftentimes the parties, by consent or
without question, submitted the controversy over the *status* of
the corporation to the judgment of the court upon the bill,
answer and accompanying affidavits, without seeking to produce
any further testimony.   In some instances it may be that the
rules applicable to motions for preliminary injunctions were,
without question, applied to the situation.   Sometimes, however,
depositions were taken and affidavits were served and read in a
manner not permitted by the practice regulating motions for
injunctions.   *Parsons* v. *Monroe Manufacturing Co., 4 N. J. Eq.
(3 Gr.) 192, 202.*

In *Rawnsley* v. *Trenton Mutual Life Insurance Co., supra,*

Chancellor Williamson held that the exercise of the powers conferred by the statute upon the court of chancery with respect to the issuing of an injunction against an insolvent corporation, was "a summary proceeding and in its nature and effect a final hearing upon" the merits of the bill of complaint. And yet the same learned chancellor allowed the complainant to proceed .with his cause to a final hearing on the "pleadings and proofs." *9 N. J. Eq. (1 Stock.) 347.* This case is reported twice. The earlier report shows that while the chancellor recognized that what he was engaged in conducting was a final hearing, the result of that hearing was determined by the insufficiency of the complainant's bill. The chancellor (at *p. 97*) having ruled that the complainant might amend his bill "and make a case upon which the court could act," there is no doubt about what under our present practice the course of procedure would have been. The summary hearing would have been continued until the bill had been amended and then the case, as presented by the amended bill, would have been summarily tried. The chancellor, however, decided that the "case made out by the pleadings and proofs" did not warrant a decree or order granting the prayer of the bill. The complainant then proceeded to file an amended bill, and under the old practice of the court, without objection, depositions were taken and the cause was again brought to a final hearing. Thus a second final hearing was had of a cause which had already been finally heard. No objection seems to have been interposed at any time to this peculiar course of procedure.

In the case of *Franklin Electric Light Co.* v. *Fort Wayne Electric Corporation, 58 N. J. Eq. (13 Dick.) 543,* the *dictum* of Mr. Justice Van Syckel is liable to be misunderstood. Chancellor McGill held in this court in that case that the decree for an injunction restraining the corporation from exercising its franchises was a final decree. This accords with the view expressed by Chancellor Williamson and with the uniform practice since his time in this court. The court of errors and appeals sustained the decision of the chancellor upon the merits of the case, but Mr. Justice Van Syckel expressed the opinion that a

bill of review was not necessary in order to obtain a reconsideration in the court of chancery of the order appointing a receiver, and states that "the order entered was not a final decree but a mere interlocutory order in the progress of the case." The order appointing a receiver is not necessarily a part of the final decree. The final decree is the decree for an injunction, this most effective and fatal decree, which virtually destroys the corporation like a judgment of ouster in a *quo warranto* case and prevents the corporation from perpetrating fraud. The order appointing a receiver may be made in connection with and as a part of the final decree, or may be made at any time after the final decree, as the statute expressly provides. The order appointing a receiver may be embodied in the final decree or may constitute the subject-matter of a separate subsequent order. Considered by itself, the order appointing a receiver is properly to be classified among interlocutory orders. It has never been intimated, so far as I am aware, that the decree of the court of chancery, made upon the summary hearing prescribed by the statute, either dismissing the petitioner's petition or the complainant's bill, or ordering that the statutory injunction be issued disabling the corporation from the exercise of its franchises, is not a final decree.

But, as I have already said, the particular point which is now before this court for consideration is not whether this bill of complaint misjoins incongruous causes of action in equity, but whether, when no objection has been made to such misjoinder, this court ought, at the same time, to hold the summary final hearing on the bill in one aspect and a motion for an interlocutory order for an injunction under the bill in another aspect. It seems to me that the court, for its own protection, ought not to allow such an inconsistent, inconvenient and confusing jumble of remedial proceedings. The rules of evidence governing the two proceedings are entirely different. In the one case, as I have indicated, what is practically a trial is held; in the other, a limited hearing upon affidavits is had and upon that hearing the responsive allegations of the answer and of the affidavits on behalf of the defendant have a special force.

My conclusion is that what now is to be considered is merely the motion for an interlocutory order for a preliminary injunction in aid of the prosecution of the cause of action set forth by the bill against all of these defendants under the general equity jurisdiction of the court. This result is in accordance with what was practically an election made by counsel for the complainant upon the oral argument. The bill, therefore, so far as it undertakes to present the statutory action against the Old Dominion Copper Mining and Smelting Company as an insolvent corporation, will be entirely disregarded.

We now reach the question whether upon the bill, answer and accompanying affidavits a case is presented for a preliminary injunction in aid of the general object of the bill, considering the bill as filed under the general equity jurisdiction of the court.

The facts are numerous and somewhat complicated. A mass of details are set forth and have been minutely discussed by counsel. I shall not state the facts in detail; a large part of my examination and study of these facts resulted in excluding them from consideration. The main grievance of the complainant grows out of a transaction which I shall describe only in a general way.

The Old Dominion Copper Mining and Smelting Company, the New Jersey corporation, owns and operates an extensive copper mining property in Arizona. The defendant the United Globe Mines (the New York corporation), in which certain wealthy and influential New York business men are interested, owns and operates an adjacent copper mining property, situate upon higher ground—upon a higher level than that of the property of the New Jersey corporation. There are indications that the mining property of the Old Dominion Copper Mining and Smelting Company is far more valuable than the corresponding property of the United Globe Mines, while the persons controlling the latter company seem to be men of greater financial strength than the persons controlling the former company. In the fall of 1903, under the pressure of financial obligations which possibly might have led to the insolvency of the Old Do-

minion Copper Mining and Smelting Company, a deal was made between the two corporations for their practical amalgamation. This deal involved the sale of the mining property of the United Globe Mines to the Old Dominion Copper Mining and Smelting Company, which was to be paid for by the issue of $5,000,000 par value of stock of the latter company. The *status* which would result from such a unification of these two mining properties and the issuing of this large amount of stock was the subject of a written agreement, set forth in the complainant's bill. Circulars were issued to the stockholders interested, calling for their approval of the plan of amalgamation and the deposit of their stock in furtherance of it. The plan was assented to by a large majority of the stockholders of the Old Dominion Copper Mining and Smelting Company and by all the stockholders of the United Globe Mines. The plan involved a meeting of the stockholders of the Old Dominion Copper Mining and Smelting Company and the subsequent necessary proceedings to increase the capital stock of the company in order that it might issue the same in payment for the property of the United Globe Mines.

At this juncture of affairs, on the 30th of November, 1903, one George B. Elliot, a stockholder of the Old Dominion Copper Mining and Smelting Company, filed a bill of complaint in this court on his own behalf and on behalf of all other stockholders of said company, seeking, as the bill in this present case alleges, "to enjoin the said scheme, on the grounds, among others, that the property of the United Globe Mines proposed to be purchased was not worth the sum of $5,000,000," which was the par value of the stock which was proposed to be issued in payment for the same. The Elliot bill further alleged that the property proposed to be purchased "was not worth to exceed $2,000,000." Upon the filing of the Elliott bill an order to show cause was granted, returnable December 14th, 1903, requiring the defendants in that suit, who included the Old Dominion Copper Mining and Smelting Company, the United Globe Mines and all or some of the directors of each of these corporations, to show cause why an injunction should not issue restraining the trans-

action above described. This order, which was made *ex parte,* contained *ad interim* restraint upon the issue of stock by the Old Dominion Copper Mining and Smelting Company for the purchase of the property of the United Globe Mines and upon the taking of any steps to carry out the particular plan of consolidation, set forth in Schedules A and B, attached to the bill, which plan included as an essential part the excessive issue of stock above mentioned.

The restraining order was most distinctly based upon the charge in the bill and affidavits that the directors of the Old Dominion Copper Mining and Smelting Company were threatening to issue stock for property purchased in fact far beyond the value of such property, and that therefore a case was presented for the intervention of this court under the principle laid down in *Donald* v. *American Smelting, &c., Co., 62 N. J. Eq. (17 Dick.) 729.* The restraining order was further sustained by charges in the bill and affidavits which implied that the directors, in arranging for this issue of stock and commending it to the stockholders, were not acting in good faith.

Upon the service of the restraining order in the above-stated case the defendant directors evidently took counsel and practically conceded that what they were proposing to do was unlawful and that the complainant had a right to an injunction restraining the issue of the amount of stock which they intended to issue for the property which they intended to acquire. By consent therefore the *ad interim* restraining order was made a permanent order of injunction, and the defendants, as distinctly appears, abandoned so much of their plan of amalgamation as included the issue of stock in the manner, to the extent and for the purpose above mentioned.

A large majority of the stockholders of the Old Dominion Copper Mining and Smelting Company, however, and apparently all the stockholders of the United Globe Mines, desired to get the benefit of the unification of their properties or the establishment of some community of interest in their management, which had been offered by the abandoned plan of amalgamation. The assenting stockholders of the Old Dominion Copper Mining

and Smelting Company also seem to have been desirous of interesting in their property the capitalists who owned or controlled the stock of the United Globe Mines. The result was that these defendants undertook to accomplish what is called a consolidation or practical amalgamation of their companies and their properties without employing in any way, as a means to that end, the excessive issue of stock which had been enjoined or any other act which could be deemed illegal. In pursuance of this purpose the defendant corporation the Old Dominion company was organized under the laws of the State of Maine. The objects of this new corporation were those of a holding company—to hold such capital stock of the Old Dominion Copper Mining and Smelting Company, such capital stock of the United Globe Mines as might be transferred to it in exchange for its own stock.

The scheme also contemplated that ultimately the new corporation might cease to be a mere holding company and would acquire and operate the combined properties of the original two companies and thus a complete consolidation would finally be effected. It does not appear that any such result was contemplated until the consent of all the stockholders of each of the two operating companies should be secured. The new plan naturally adjusted the interests of all the parties concerned, as far as possible, in accordance with the plan of amalgamation, which they had been obliged to abandon.

I do not deem it necessary to set forth the figures and other details which the complainant exhibits in order to establish the proposition which seems to be uncontroverted and incontrovertible that the defendants have endeavored by their new plan to divide up among themselves their stock interest in the two corporations which is their own absolute property in the same way and according to the same rule of allotment which had been applied to the combined properties of the two corporations under the rejected plan of amalgamation, and have also endeavored, as far as possible, to establish conditions which would result in a friendly and harmonious operation of the properties of each of the two original companies under the control of their respective boards of directors.

The complainant's bill and accompanying affidavits, however, charge that what the defendants have done or are threatening to do is to accomplish "an evasion of the restraining order" issued by this court in the former suit, which still, I believe, is pending. Through pages of this bill and accompanying affidavits we find the charge reiterated and the evidence presented to sustain the charge that the defendants are endeavoring to accomplish the very object which in the former suit the court condemned. In my judgment this whole argument of the complainant is entirely fallacious. In the former suit this court did not even by its *ex parte* order, imposing merely temporary restraint which the defendants subsequently, without argument, by consent allowed to be made a permanent injunctive order, undertake to condemn the amalgamation of these properties, or to enjoin these defendants from unifying their interests, or enjoin any defendants from doing anything excepting the issuing of a large amount of capital stock in flagrant violation of the statute and of the rights of Mr. Elliot, a non-assenting stockholder. If the defendants, including all the stockholders of the other corporation, can "amalgamate," or "consolidate," or establish a "community of interest," or accomplish all the objects which they sought to accomplish by their former plan of amalgamation with the exception of the illegal issue of stock, then there is no evasion of any injunctive order of this court. If such be the case, the defendants may be entitled to commendation for having the intelligence and sagacity as business men necessary to enable them to accomplish a complicated and difficult transaction, presumably beneficial to themselves, by pursuing strictly legal means when apparently after careful study on the part of experts it had formerly been thought that for the accomplishment of the same purpose an illegal issue of stock would be necessary.

Of course, it may be true that the defendants, upon carrying out their substituted plan, cannot lawfully do many of the things which were provided for and contemplated under the original plan which was discarded. The important question, however, is not whether the defendants, or any of them, are

endeavoring to "evade" the restraining order in the former suit, but whether they are threatening to do anything which is illegal which the complainant has a right to have enjoined by this court. A charge that the defendants have violated the injunction of this court can be dealt with in proceedings in the former suit to have them punished for contempt. The bill, however, seems to rely upon the restraining order in the former suit as having the effect to make something *res adjudicata* in this suit. The complainant in this suit was joined as a party complainant in the former suit, and the most of the defendants in the two suits are the same persons and corporations. But, as I have stated, the carrying out of the original plan was enjoined because it included this excessive issue of stock to which the complainant had a right to object. This objectionable feature has been eliminated from the substituted plan. Whether, therefore, any other features of the substituted plan are unlawful and open to objection in this court on the part of the complainant is a question to be decided for the first time by this court in this suit. The objectionableness of any such features is not in any way established by showing that they constituted a part of the original and discarded plan.

When we dismiss the charge that the defendants are to be enjoined in this suit because they are "evading" the restraining order in the former suit, I do not think that there is much substance left in the charges of misconduct against the defendants presented in the bill of complaint, and I shall not undertake to discuss these charges minutely, which would be impossible within the reasonable limits of this opinion.

The original plan was set forth in certain papers which include an agreement, dated October 23d, 1903, between the Old Dominion Copper Mining and Smelting Company of the first part, the United Globe Mines of the second part, the firm of F. S. Mosley & Company, of Boston, who were the promoters and banking agents through whom the plan of amalgamation was to be carried out, of the third part, and the stockholders of either of the two corporations who should signify their assent to the agree-

ment by depositing their stock as prescribed therein, of the fourth part.

The substituted plan, the plan to accomplish substantially the same objects which the abandoned plan had in view, with the exception of the illegal element, is set forth in a circular issued by F. S. Mosley & Company, and particularly in an agreement, dated December 30th, 1903, which is strictly between the stockholders of the Old Dominion Copper Mining and Smelting Company, who executed the same, of the first part, the stockholders of the United Globe Mines, who executed the same, of the second part, and F. S. Mosley & Company of the third part. Neither the Old Dominion Copper Mining and Smelting Company nor its directors as such have in any way assented to this stockholders' agreement or attempted in any way to become bound thereby. The whole plan, which the bill denounces as a "scheme to circumvent the operation of the aforesaid restraining order of this court and to carry out the consolidation and amalgamation of the Old Dominion Copper Mining and Smelting Company, and the United Globe Mines properties substantially on the basis of the agreement of October 23d, 1903," appears to me beyond question to be a perfectly lawful agreement between the stockholders who see fit to execute the same. If the stockholders of the Old Dominion Copper Mining and Smelting Company, by this pooling arrangement with the stockholders of the United Globe Mines, through the instrumentality of this holding company, are giving to the latter class of stockholders a larger share of the gross earnings of the pool than the complainant thinks just and fair, that is no concern of his; the complainant is not obliged to go into this pool. The allegation of the bill that the plan is adopted for the purpose of coercing the complainant and other stockholders of the Old Dominion Copper Mining and Smelting Company "into consenting to an amalgamation or a consolidation of the properties of the two companies on an illegal basis," stands unsupported by any proof.

There are some charges in the bill and affidavits indicating that in fact the control of the Old Dominion Copper Mining

and Smelting Company has been transferred from its board of directors to some individual or individuals interested in other and perhaps rival corporations. The answer and accompanying affidavits deny positively that there is any amalgamation of the two corporations, the Old Dominion Copper Mining and Smelting Company and the United Globe Mines; declare positively that they are operated as absolutely distinct properties, and deny all the charges which impeach the conduct of the directors of the Old Dominion Copper Mining and Smelting Company or charge such directors with any abnegation of their functions or other violation of duty.

The original plan of consolidation, which was abandoned, embraced a project for what the bill claims to be an unlawful "segregation of assets" of said corporation, the vesting of such assets in a trustee and the appropriation thereof in a way prescribed which includes a distribution of a portion among the original stockholders of the corporation. The stockholders' agreement of December 31st provided that the holding company to be organized, the Old Dominion Company of Maine, should

"make provision by by-laws or agreements, or both, for the realizing upon all the assets of each company not included in paragraphs 4 and 5 as advantageously as is reasonably possible, and *so far as it lawfully can*, in accordance with the direction and under the management of the assenting stockholders of said respective companies and their assigns, and for the distribution, *so far as lawfully may be done*, of all net proceeds of such assets when realized upon and for the payment to the assenting stockholders of said companies, respectively, and their assigns, *pro rata*, of the sums received from such distribution by said Maine company or its assigns in respect of the stock of said respective companies required by it under this agreement."

Counsel for complainant argues that the original plan above set forth for "segregating" a portion of the assets of the Old Dominion Copper Mining and Smelting Company is unlawful and violative of the rights of non-assenting stockholders. It may be conceded that this position is substantially correct, and that if the corporation, through its board of directors or otherwise, were undertaking to do this thing, the complainant would be entitled to have it enjoined. But neither the Old Dominion

company nor its board of directors are threatening to carry out any scheme for segregating and distributing among stockholders any part of the corporate assets. What is done or threatened is simply this, that these stockholders of the two original corporations. agree that the holding company which they propose to create shall "make provision, by by-laws or agreements, or both," for carrying out the plan of segregation and distribution to which the complainant objects. It would seem that the provision in these by-laws is to relate only to the accomplishment of the proposed scheme *so far as lawfully may be* done. But if express limitation to lawful action does not cover the whole plan, it still remains that the holding company is merely to provide for the accomplishment of the plan "by by-laws or *agreements,* or both." There is no reason why the holding company should not provide for carrying out the objectionable plan of segregation by an *agreement* with all the stockholders of both companies, including the complainant. But this charge of unlawful segregation of assets is directly met by the defendants' answer and affidavits, which disclose the agreement which has been made in regard to this matter between the Old Dominion Company of Maine and the stockholders of the Old Dominion Copper Mining and Smelting Company, who exchanged their shares for shares of the Maine company. There may be difficulties in carrying out this agreement, but that is an affair in which the parties alone are concerned. I cannot see that there is anything in the agreement which gives the complainant the right to an injunction. The Old Dominion Copper Mining and Smelting Company is not a party to the agreement, and, as these affidavits show, has full control of its own assets.

My conclusion in regard to this charge of unlawful "segregation" of assets is that no unlawful acts are proved to be contemplated by anyone, and certainly not by the board of directors of the Old Dominion Copper Mining and Smelting Company.

The last charge of the bill which requires consideration grows out of the intermingling of the pecuniary interests of the stockholders of the United Globe Mines and a majority of the stock-

holders of the Old Dominion Copper Mining and Smelting Company, effected by the organization of the holding company, which owns practically all this pooled stock, and necessarily controls the election of all the directors of the other two companies.

Counsel for complainant makes numerous objections to the control of the Old Dominion Copper Mining and Smelting Company by its present board of directors, who hold office practically under the appointment of the holding company, while some of them are also directors, and therefore stockholders, of that company. I shall not consider all of these objections, which, if valid, would seem to make the device of a holding company for the pooling of the stock of private business corporations wholly impracticable, where the constituent companies are to have any business relations with each other.

The most important objection which is urged against the present *status* of these three corporations on behalf of the complainant as a non-assenting stockholder of the Old Dominion Copper Mining and Smelting Company might be made with equal force on behalf of a non-assenting stockholder, if there were one, of the United Globe Mines. This objection grows out of the fact that of the seven directors of the Old Dominion Copper Mining and Smelting Company three are directors, and therefore stockholders, of the Old Dominion company.

It is insisted that the rules of equity in regard to common directors are applicable to all the contracts and business relations between the two original mining companies, and that by those well-settled rules all such contracts are voidable at the option of the complainant, a non-assenting stockholder, and the complainant undertakes to exercise his option in advance and have all contracts between the two corporations prohibited by an injunction. The first answer to this objection is that the two corporations have no common directors. The fact that their boards may be, and undoubtedly are, appointed by this holding company, does not subject the government of the two companies to a common control. The complainant's argument implies that the directors of the holding company will appoint "dummies" as directors of each of the two original companies, so that

in fact the directors of the holding company will be the directors of both of the other companies. The proofs, however, utterly fail to establish any such situation. The answer and accompanying affidavits most positively deny that any such condition in fact exists.

The real question which may arise when a contract is made between these two corporations which the complainant, as a non-assenting stockholder, asks to have enjoined, seems to me to be this: If three of the directors of the Old Dominion Copper Mining and Smelting Company are directors, and therefore stockholders, of the holding company, and as such have a pecuniary interest in the entire stock of the United Globe Mines, which the holding company owns, must they be deemed to have such a pecuniary interest in the property and earnings of the United Globe Mines as to disqualify them from making, and in fact render the entire board of directors of the Old Dominion Copper Mining and Smelting Company incapable of making. a binding contract with the United Globe Mines? It seems to me that the statement of this question, in view of the complex relations between corporations at the present day and the wide use of holding companies, suggests that great caution should be observed before answering it favorably to the complainant. The three directors of the Old Dominion Copper Mining and Smelting Company who are stockholders of the holding company, are not contracting with themselves when they join their associates in making a contract with the United Globe Mines. They are, however, making a contract in which they *may* have a pecuniary interest in throwing the profit to be derived from the transaction into the treasury of the corporation with which they thus cause their own corporation to contract. They may, however, act in exactly the contrary way and from a similar selfish motive. It is not clear that their interest, in every instance, would lie with the corporation with whom they are contracting. All the stockholders of the United Globe Mines are practically jointly interested indirectly in the property and earnings of both the original companies. In my opinion, this is a situation where a non-assenting stockholder of either of these corporations cannot

be allowed to exercise an arbitrary power to enjoin contracts between the companies, especially before any definite contracts have been attempted to be made. It will be time enough to entertain the grievance of this non-assenting stockholder when he presents to this court a contract made or contemplated between these companies which is inequitable or in any way unfair toward the interest which he represents.

In the case of *Robotham* v. *Prudential Insurance Co., 64 N. J. Eq. (19 Dick.)* 673, 709, I expressed some views as to the alleged right of a single stockholder to have a contract between his corporation and another corporation enjoined merely because of the presence of a "common director." Those views, if correct, apply with greater force to the present situation, inasmuch as the three directors of the Old Dominion Copper Mining and Smelting Company, who are alleged to have an interest in the property and earnings of the United Globe Mines, are not directors of the last-named corporation and are not stockholders thereof. Their interest, apart from the stock which they hold of the Old Dominion Copper Mining and Smelting Company, is to have the stock of the Old Dominion Company of Maine, the holding company, declare as many and as large dividends as possible. Such dividends come from the pooled earnings of the two mining corporations.

But the discussion of this subject of the disqualification of these two corporations to contract with each other while they are connected by this holding company unless all of the stockholders of each of the two companies shall assent to the contract, seems to be premature in view of the facts disclosed by the affidavit of the defendant Charles S. Smith, the president of the Old Dominion Copper Mining and Smelting Company, who, from the allegations of the bill as well as those of his own affidavit, appears to be thoroughly informed in regard to all the transactions under examination in this suit. This affidavit states that the two mining companies "have no contract relations with each other." This affidavit, however, also states that it is contemplated as soon as the smelter of the Old Dominion Copper Mining and Smelting Company is finished that it will

smelt ores for the other company at current rates, and alleges that such business will be profitable to the former company, and alleges that "in many other ways friendly relations between the two companies, whose mines adjoin, will bring about economies in the management and in increased earnings."

There is nothing in such business relations calling for any complaint on the part of this complainant. When any proof can be presented that the directors of the Old Dominion Copper Mining and Smelting Company have made a contract with the other company for smelting its ores at rates which yield a profit to the latter company at the expense of the former, the question may then be presented for consideration to this court by a non-assenting stockholder, such as the complainant, whether such contract should not be declared void. It may be that any contract between the two companies which may be made would receive the assent of the complainant. This court certainly will not grant the complainant an injunction restraining the Old Dominion Copper Mining and Smelting Company from smelting ores for the United Globe Mines, or from making a contract to smelt such ores before any contract has been formulated, before anyone can know the terms on which such contract may be made and before any stockholder has had an opportunity to approve or disapprove of such contract. Such an injunction, it seems to me, would be carrying the right of a non-assenting stockholder to interfere with contracts made by his corporation while laboring under the disability of an "interested" director almost to an absurdity.

I know of no case, certainly none has been cited, where a single non-assenting stockholder of a corporation has been allowed to exercise the arbitrary option to procure from a court of equity an injunction prohibiting the carrying out of a contract between his corporation and another corporation, the fairness of which is in no way questioned, upon the sole ground that one director, or any number of directors less than a majority of his company, own stock in a third corporation, which third corporation owns stock in the corporation with

which the board of directors of the corporation of such non-assenting stockholder had undertaken to contract.

The motion for a preliminary injunction and receiver is denied.