The complainant filed a bill against the defendant under the provisions of the New Jersey Securities act (P.L. 1927 ch. 79 p.138), and the acts amendatory thereof and supplemental thereto, which bill is verified by the affidavit of the special assistant attorney-general, who investigated the situation, and to whose affidavit are annexed several exhibits.
The defendant filed no pleading herein up to the return day of the order to show cause, but went to hearing on the bill and affidavit and exhibits annexed to the affidavits of certain of the promoters, officers and employes of the defendant. The day after the hearing, and the day after the making of the final decree herein, the defendant filed an answer. Upon the hearing reliance was only had upon the bill, affidavit and exhibits, and the affidavits put in by the defendant. The case was fully argued by both sides upon the theory that it was on final hearing, and submitted to the court for decision. All the questions were fully argued by counsel on both sides; and immediately upon its conclusion the court decided the case, and shortly thereafter signed the final decree. While no objection was made to the summary hearing, the defendant in its petition of appeal now says that the hearing was preliminary and it is entitled to another. Not so. *Page 299 
These proceedings under the New Jersey Securities act are akin in a great measure to those against insolvent corporations underComp. Stat. p. 1640 § 65, which provides among other things that the court may proceed in a summary way to hear the affidavits, proofs and allegations offered on behalf of the parties, and if it shall appear to the court that the corporation has become insolvent, it may issue an injunction; and by § 66, may appoint a receiver.
In Pierce v. Old Dominion, c., Smelting Co., 67 N.J. Eq. 399,
Vice-Chancellor Stevenson said (at p. 410): "On the return day of the order to show cause the statute prescribes a `summary hearing' of the `affidavits, proofs and allegations which may be offered on behalf of the parties.' Under our modern practice in the vice-chancellors' courts this summary hearing often is, and always will be, where justice so requires, a complete trial of the issues presented by the pleadings. The defendant corporation may present an answer or only affidavits, and may, without answer or affidavits, contest the charges contained in the complainant's petition or bill. * * * After the summary final hearing no process of subpoena is issued, or ought to be issued. The entire function of process has been performed by service of the statutory notice under direction of the court. * * * No other subsequent final hearing can be had."
Process is the means of compelling a defendant to appear in court; and it need not necessarily be a subpoena or other writ, it may be an order or notice. Every state has the power to prescribe a reasonable notice which shall be given in order to subject a defendant to the jurisdiction of its courts. In reMartin, 86 N.J. Eq. 265, 273.
The New Jersey Securities act in every section indicates that the suit is one of summary jurisdiction; if anything were wanting to show that the court has summary jurisdiction in these matters as in § 65 of the Corporation act, it is furnished by the amendatory act of 1930 (P.L. p. 254), approved four months before this bill was filed, which amends § 6 of the original act by providing among other things "that the court may proceed in a summary way to hear affidavits, *Page 300 
proofs and allegations which may be offered on behalf of the parties," c., having already provided in the original act for the issuance of injunction and appointment of a receiver.
The defendant company was incorporated on December 2d 1927, with an authorized capitalization of ten thousand shares of seven per cent. cumulative preferred stock of $100 per share, and twenty thousand shares of no par value common stock. Following the organization of the corporation nine thousand shares of no par value common stock were issued to the promoters and organizers for promotion work, but no estimate was made of the value of their services, so it cannot be told what valuation the corporation held or considered this stock to have had. Contract was entered into between the corporation and Marquis T. Perkins, whereby he was to sell the stock of the corporation and receive a commission of twenty-five per cent. of the subscription price. On April 30th, 1930, $111,110 work of stock of the corporation had been sold, while $51,882.28 was the cost of organizing and distributing that stock, which showed that the net worth of the corporation's property had depreciated to $59,227.72.
Joseph R. Cheesman, the president of the corporation, received several thousand shares of the common no par stock of the corporation, for which he paid nothing, and later sold seven hundred and forty-five shares of that stock to the corporation itself at $5 per share, which the corporation purchased out of capital, having insufficient earnings to pay for it out of surplus; and Cheesman obtained $3,725 in cash for stock for which he had paid nothing except, perhaps, some work in organization,c., which was never valued. He says in his affidavit that he intends to pay back the $3,725 and the company lists it as an asset.
The defendant company said in its circulars that dividends had consistently been paid by the corporation, while, in fact, the total earnings of the corporation from its organization, December, 1927, up to and including June, 1930, were $1,728, while dividends totaling $3,401.02 had been paid. It is apparent that the corporation had not earned sufficient *Page 301 
money to enable it to pay such dividends out of the earnings and also the cost of sale of its securities, organization expenses and operating overhead, and its deficit on that date was $43,429.67.
Although the business of the corporation was to loan money on first mortgages, it spent considerable sums in the purchase of securities of other corporations, to the damage and impairment of its financial condition. One purchase was that of stock of the Burlington Real Estate Company, a competitor of the defendant, which was headed by the officers and directors of the defendant corporation. Its president was Cheesman, who was the president of the defendant.
At the time of the organization of the corporation, two men, Messrs. Perrine and Dickson, appeared before the directors and stated they were entitled to a large number of shares of common stock for work, labor and services in organization of the company. The officers of the corporation, acting under orders from the board of directors, thereafter issued three thousand shares of the corporation's no par common stock to Perrine and Dickson, as payment for organization expenses, neglecting, however, to establish the actual money value of the services they had performed. Later, at a special meeting of the directors, Perrine stated that he was attempting to procure capital with which to operate the company's business, and urged that members of an advisory board be procured, consisting of men of wide acquaintanceship and esteem, so that he might thereby be able to more readily dispose of the corporation's securities. There was issued to him six thousand shares of common no par stock, to be used in the procurement of members of the advisory board, the board of directors, however, not establishing the value of his work or the stock so issued for it.
Cheesman, the president, being examined by the special assistant attorney-general, testified as follows:
"Q. At the time of the organization, was nine thousand shares of stock issued to Perrine and Dickson?
A. Three thousand at one time and six thousand at another. *Page 302 
 Q. What did they pay for that stock?
A. Well, the first three thousand, I do not suppose they paid anything. That was for services rendered.
Q. What did they pay for the six thousand shares?
A. That was supposed to be in services.
Q. Was it ever revealed to purchasers of stock that nine thousand shares had been issued for services rendered?
A. They knew that some stock had been issued.
Q. What did Perrine and Dickson do with their stock?
A. Well, they disposed of some of it gathering advisory board members and selling some stock and using it as expenses.
Q. Did the company ever receive any benefit from the sale of that privately owned stock?
A. I would not say so, in money.
Q. At what price did Perrine and Dickson sell that privately owned stock?
A. Well, from $5 to about $15. I think $15 was the highest."
The defendant company advertised and offered for sale its capital stock in units of one share of preferred and two shares of common no par stock at $150 per unit, and at the time of the negotiations and sale of the company's capital stock it concealed and suppressed the fact that nine thousand shares of the authorized capitalization of twenty thousand shares of no par common stock had been issued without receipt of any valuable monetary consideration by the corporation; at least, it made no estimate of the value of services for which it had been issued, while the actual value of this common stock which it was selling had practically no value; and in the sale of the grouped stock just mentioned at $150 per unit, the company suppressed and concealed the fact that $37.50 of every unit so sold was being used to defray the selling expenses of that security. While under the terms of the contract between defendant and Perkins he was to receive twenty-five per cent. commission on all securities sold by him, the amount of money disbursed for selling and organization expenses has exceded forty-six per cent. *Page 303 
The agent Perkins had purchased for the defendant $14,730.60 worth of mortgages on improved property in Burlington county, and paid therefor by various quantities of the common stock of the defendant corporation. Perkins received as commissions on these transactions $3,682.65; it thus appearing that the income of the corporation from that transaction will be insufficient to take care of all the cost of acquisition for nearly three years' time, and the amount of stock so issued and delivered will not be productive of results to the company for a considerable period.
The defendant purchased sixty-seven shares of the stock of the Burlington Real Estate Company at $100 per share, which was irregular; Cheesman, as already said, was president of both corporations, and Taylor also was treasurer of both concerns. This purchase was in dereliction of the duty of those officers, which was due the defendant — to say nothing of the other party, to which it was entirely favorable.
It is shown that Perkins, who is acting as agent of the company in the sale of securities, is in an embarrassed financial condition and has borrowed money from it and now owes it on account of loans and advances a sum in excess of $6,800. This he does not deny, although he makes an affidavit in the case.
Another instance of investment by the defendant corporation is this: Perrine, before mentioned, purchased for defendant ninety-five shares of the capital stock of the Wrightstown National Bank for $9,500. This stock was held for a considerable time and then sold back to the bank for $8,550, making a loss of $950. At the same time a commission of $2,500 was paid by defendant to Perrine and an associate named Oliver, with the result that the company lost $3,450 on this transaction.
The company in the sale of stock issued certain circulars, one of them described the corporation as: "A strong financial institution, which has been functioning for some time and has proven to be one of the safest and most profitable enterprises in the State of New Jersey." "This institution is state-wide in its aspect. Operations will cover the whole State of New Jersey." *Page 304 
At the time of the issuance of this circular the company had not been functioning for any considerable period of time and had never proven itself to be safe and profitable. It appears to have been insolvent at the time. It was not in any sense of the phrase state-wide, its activities having been confined to the sale of securities and the loaning of money on mortgages in twenty-two transactions in the county of Burlington.
In the circular listed under the heading, "Directors and Advisory Board," the names of eighteen different prominent men, with their vocations and titles, are specifically set forth. A great number of these men were merely stockholders and had no interest or voice in its management or direction. Their only value and interest to the corporation was to render more easy and expedient the sale of its stock.
Defendant in the sale of its stock stressed the fact that dividends had been consistently paid by the corporation; when, in fact, the corporation up to that time had not earned sufficient to enable it to meet the cost of selling its securities, organization expenses and its operating overhead.
The defendant prepared and published a financial statement, dated February 1st, 1930, which revealed a surplus of $24,237.89. That statement did not include all the liabilities of the corporation, and listed at its bottom under the title, "Auditors," William C. Jones, Glenn Lindabury, and W. Emery Cheesman. These men were not auditors but were officers and directors of the corporation. None of them seem to have been qualified to determine the true financial condition of the corporation. The undoubted impression created in the minds of the readers of the statement was that three disinterested individuals had examined the books of the defendant corporation and had prepared that statement, to which they were then and there certifying that it was correct, when, in fact, it was untrue.
In the statement put out by the company on February 1st, 1930, resources and liabilities are listed. It will be observed that in this statement no mention is made of the liability for the value of the common stock. The alleged *Page 305 
surplus of $24,237.89 I cannot find to exist, except in this bookkeeping scheme. The company, in my judgment, was insolvent at the time and could not have met its obligations.
The statement of February 1st, 1930, showed "Surplus," $24,237.89, while that of July 18th, 1930, showed a surplus of $7,672.36. Of course the surplus might have sunk legitimately to that amount subsequent to the statement of February 1st, 1930; but the figures are significant. Another thing: The circular (Schedule B, p. 1) says: "Capitalization, ONE MILLION DOLLARS." This is significant, also. They never had a million dollars or could ever hope to have a million dollars, by the sale of stock, and that is the only way they could get it. It was of course intended to deceive the public. While the defendant company was incorporated with an authorized capitalization of ten thousand shares of seven per cent. cumulative preferred stock of the par value of $100, and twenty thousand shares of no par value common stock, and no money, it nevertheless, in an annual report filed in the office of the secretary of state, April 29th, 1930, says that the authorized capital stock is $1,000,000, without the charter having been amended; and this latter provision is therefore illegal.
The affidavits of Joseph R. Cheesman, William E. Taylor, M.T. Perkins, J.G. Rearick, I.J. Keuper, Harry I. Perrine and E.R. Dickson, are quite general where they touch salient facts, and are quite unsatisfactory. Mr. Killie, the solicitor, makes a purely formal affidavit about handing copies of affidavits to the assistant attorney-general.
For instance, Mr. Cheesman says that in none of the literature or advertisements circulated for the purpose of securing subscriptions to the stock of the company, were there any false or misleading statements concerning the condition of the company; that no statement or representation was ever made by an agent or solicitor of the company, to the best of his knowledge, which was false or misleading, and that the agents and solicitors employed by the company were instructed to make no false or misleading statements concerning *Page 306 
the company or its business; that the defendant company is not, and never has been, insolvent. He says, though he did not inform the attorney-general, that the no par common stock was valued at $1 per share, that of that stock there were issued six thousand eight hundred and fifty-two shares at $1 each, making $6,852, and subscribed, but not paid for, five hundred and thirty-three, at $1 each, $533; that a part of the common stock available for issuance to persons with an idea of interesting them in the corporation, was issued to him, he was to sell the stock, but failing to do so, he says he agreed to refund the $3,725 to the company, and that that item is listed in accounts receivable in the statement of July 18th, 1930. As to the stock of the Wrightstown National Bank, they thought that by purchasing it they could secure the assets of the bank and also interest prominent people in the company; that the company acquired seventy-five shares of the stock of that bank at $100 per share "in nearly every case giving our (their) stock in exchange for same, only $1,000 in cash being paid;" after holding the stock for a while they found, or concluded, that the original plan of having the bank liquidate, was not practical, and they sold all of the stock of the bank to the First International Surety Company of New York, and lost $750 in all. It will be observed that the only difference between the attorney-general's affidavit and the defendant company's, is the amount of loss on this stock, which the former asserted was $950, while the defendant stated that it was $750, making a difference of $200; but notwithstanding that, a substantial loss on the resale alone, nothing being said as to the commission of $2,500 paid for the acquisition of the shares.
William E. Taylor, secretary and treasurer of defendant company, swears that he has read over the affidavit which Mr. Cheesman, the president, had made, and that so far as the same relates to the acts of the corporation and the transactions of said corporation, the same is true. Of course, no man can swear that the contents of another affidavit is true. This statement falls of its own weight, and should never have *Page 307 
been made. He also states that the value of the common stock has been fixed by the directors at $1 per share; that William R. Kennedy, the first secretary of the corporation (not being paid for his services), removed and took with him certain books and papers of the company, and that they have not been able to locate him. He says that the contract with Perkins was for commissions of twenty-five per cent., and that the company has never paid either to him or anyone else in commissions, in excess of that amount for selling the stock; that he has seen literature and advertisements used by the agents and solicitors engaged in selling stock of the company, and that there were no false or misleading statements contained therein, nor any attempt in such advertisements and circulars to mislead anyone as to the business of the corporation and its condition, and that the agents and solicitors were instructed by the officers of the corporation to make no misrepresentations or fraudulent suppression of facts in the sale of stock.
Perkins says in his affidavit that to accomplish the purpose of the company it is necessary that it should have available a minimum of $250,000 to $300,000, preferably all raised by stock sales, or alternatively could be raised by bond issue against the securities now in hand, and to make up the difference between the amount of capital now subscribed and the reasonable amount of funds for turnover investments.
The company has never had anything like either of those sums, and if that be necessary for it to successfully accomplish its purpose, it of course was not successfully accomplishing it at the time of the final decree in this case, an injunction awarded, and the appointing of a receiver. Perkins makes denial of ever making false statement himself or by salesmen under his control. He says he is of opinion that the defendant company is in liquid condition and shows by its statement assets greatly in excess of its liabilities. This shows, if it shows anything, that he places a real value upon the stock of the concern, which, in my judgment, is practically worthless. *Page 308 
J.C. Rearick, a salesman employed by Perkins, says that instructions were given him that there were to be no misrepresentations made to any person or persons to obtain any sale of stock, nor was there to be any concealment of material facts concerning the company, its operation, officers, financial condition or otherwise, and that we (salesmen) were to furnish proposed stockholders or subscribers with "the truth, the whole truth and nothing but the truth, in obtaining subscribers to stock;" that that had been in every instance carried out by him in every sale of stock for the company.
These gentlemen who testify for the defendant o'er-leap themselves and protest too much.
I.J. Keuper, a salesman employed by Perkins, makes a like affidavit.
Harry I. Perrine, who acted as a temporary officer at the organization of the company, was afterwards connected with it, together with Dickson, under the name of Perrine Dickson, says that the proceeds of sale of any stock issued in accordance with the plan of the company from and above the value of $1 never was a part of the corporate funds, never was accountable to the corporation and should in nowise be entered upon the record of the transcripts of the defendant (and evidently never was accounted for to the company), and that the matter was thoroughly understood by the directors, and the resolution which was submitted to and adopted by them clearly included such outline of capital set-up, so far as the six thousand shares voted at the meeting were concerned.
It is a well known principle of law that the actions and utterances of men are presumed to have their intended effect, no matter what they say was the intention. Now, there is no denial of the issuance of these circulars, in fact it is admitted; and that they were intended to deceive the public, at least the gullible part of it, is perfectly apparent. A small corporation, organized in a small place, without capital, save as it sold its stock, is advertised to be: "A strong financial institution, which has been functioning for some time and *Page 309 
has proven to be one of the safest and most profitable enterprises in the State of New Jersey." "This institution is state-wide in its aspect." "Operations will cover the whole State of New Jersey." Nothing of which was true. The literature was clearly intended to lull the purchasing public into a sense of security in buying the stock of this concern.
I do not say that the men who composed the officers and the directorate of this company, were not personally honest men and men of standing in their community; but I do say that they were chasing a will-o'-the-wisp in this instance, endeavoring to work an age-old scheme of transmuting base metal into gold, of conceiving that something could be made out of nothing, in which effort they were unsuccessful, and such of the public as have invested in their securities, to use a modern phrase, have been left holding the bag.
The transactions carried on by this concern come within many of the prohibitions denounced in the Blue Sky law, the intention of the legislature being to protect those from investing in a scheme who otherwise would have no protection.
The recent case of Stevens v. Adelphia Finance Service,107 N.J. Eq. 222, is so like the present case in all its salient features that it is submitted that it governs the case at bar, and shows the wisdom of the adjudication contained in the final decree, in the issuance of an injunction and the appointment of a receiver under the statute in this case. *Page 310