813 A.2d 601 (2003)
356 N.J. Super. 534
STATE of New Jersey, Plaintiff-Respondent,
v.
Mindy ANASTASIA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 1, 2002.
Decided November 4, 2002.
Decided January 16, 2003.
*602 Yvonne Smith Segars, Public Defender, attorney for appellant (Bernadette DeCastro, Acting Deputy Public Defender II, of counsel and on the brief).
Peter C. Harvey, Acting Attorney General of New Jersey, attorney for respondent (Frank Muroski, Deputy Attorney General, of counsel and on the brief).
Before Judges WALLACE, JR., CIANCIA and AXELRAD.
The opinion of the court was delivered by CIANCIA, J.A.D.
The primary issue addressed in this appeal is whether a civil notice from a state agency advising that a child has been removed from his or her home without a court order constitutes "process" within the meaning of a criminal statute that prohibits interference with custody "after being served with process." We hold that it does not.
Defendant Mindy Anastasia, also known as Mindy Durando, was found guilty after a jury trial of violating that portion of N.J.S.A. 2C:13-4 which provides:
a. Custody of children. A person, including a parent, guardian or other lawful custodian, is guilty of interference with custody if he: ... (3) After being served with process or having actual knowledge of an action affecting the protective services needs of a child pursuant to Title 9 of the Revised Statutes in an action affecting custody, but prior to the issuance of a temporary or final order determining custody rights of a minor child, takes, detains, entices or conceals the child within or outside the State for the purpose of evading the jurisdiction of the courts of this State....
The facts were disputed at trial, but for present purposes we need only summarize the State's proofs. The Division of Youth and Family Services (DYFS) had become aware that defendant had recently given birth to a boy on January 6 or 7, 2000. Defendant had given birth out-of-state and then returned to New Jersey. Based upon the agency's prior dealings with defendant, some information that the infant had experienced a small weight loss, and the agency's belief that defendant was a flight risk, DYFS decided it would exercise its authority under N.J.S.A. 9:6-8.29 and take the *603 infant from defendant without a court order.[1]
The problem from the agency's point of view was that DYFS did not know where to find the infant. DYFS, therefore, devised a plan to confront defendant and obtain information about the infant, who was then approximately six weeks old. At least a week in advance, DYFS knew that defendant planned a birthday lunch at a local restaurant on Friday, February 25, 2000, for one of her other children, a daughter. That child was already in DYFS custody and was accompanied to the lunch by a DYFS employee assigned to the Adoption Resource Clinic. During the course of this birthday lunch, two DYFS employees and several local police officers confronted defendant and sought the whereabouts of the infant boy. Defendant denied having a newborn child. At some point defendant was handed a two-page form entitled "NOTICE OF EMERGECY REMOVAL PURSUANT TO N.J.S.A. 9:6-8.29 and 9:6-8.30 WITHOUT COURT ORDER." This notice set forth defendant's name and address and went on to state that "official notice" was being given that DYFS "has removed A D [the name of the child was spelled out] from your home and placed him in protective custody in foster care." The notice went on to state that defendant should appear at the "Juvenile and Domestic Relations Court of Monmouth County" at 2:30 p.m. on February 28, 2000, "at which time a hearing will take place." The second page of the notice told defendant she had a right to legal representation. The final paragraph read:
The Division of Youth and Family Services is required by law to conduct an investigation of the circumstances leading to and resulting in the child's injury or condition and on the basis of that investigation will determine whether further action is warranted to ensure the child's safety. We would greatly appreciate your cooperation with this agency during the course of the investigation and assure you that we will take every measure possible to protect you and the child in this matter.
The notice closed "Very truly yours" and was signed by a DYFS caseworker. Throughout the trial this notice was referred to as a "DOD letter."[2]
After receiving this notice in the restaurant, defendant continued to deny the existence of her infant son. In addition to the *604 notice, defendant was told verbally by the police and DYFS workers that she was obligated to reveal the whereabouts of the child. Defendant refused to provide the requested information, was arrested and taken to police headquarters.
In fact, the infant was being cared for at the time by defendant's neighbor, Sharon Chisolm, a certified "Family Child Care Provider." Chisolm testified that the infant was a "beautiful little boy that was well, very well cared for." When, however, defendant did not return to pick up her son, because defendant was in police custody, Chisolm could find no other person to retrieve the child and eventually called the police. The police, in turn, notified DYFS which then took custody of the child.
Defendant raises several issues on appeal. We find three of them meritorious. Throughout the litigation there was a running dialogue about whether the DOD letter handed to defendant constituted "process" within the meaning of N.J.S.A. 2C:13-4a(3). The trial judge ultimately concluded as a matter of law that the letter was process within the meaning of the statute. We agree that the issue was a question of law, not a question of fact, but we disagree with the trial court's conclusion.
The term "process" is undefined in the New Jersey Code of Criminal Justice. We are guided initially by the canon of statutory construction that cautions us to strictly construe a criminal statute. If there is an ambiguity in the statute, or if more than one reasonable interpretation may be made, then construction is drawn against the State. State v. Valentin, 105 N.J. 14, 17-18, 519 A.2d 322 (1987); State v. Marchiani, 336 N.J.Super. 541, 545, 765 A.2d 765 (App.Div.2001); see State v. Austin, 335 N.J.Super. 486, 489, 762 A.2d 1052 (App.Div.2000).
The criminal statute speaks of "being served with process or having actual knowledge of an action affecting the protective services needs of a child pursuant to Title 9 ...." N.J.S.A. 2C:13-4a(3). Obviously, the criminal statute is referencing civil actions. Process in that context has a well understood, if not perfectly defined, meaning. It is typically that which compels a party to appear in court. Usually process will issue from a court or through counsel with the authority of the court. Most commonly, process consists of a summons, an order to show cause, a court order, a subpoena, a warrant, or even a writ. Williams v. Bd. of Educ., 124 N.J.L. 380, 12 A.2d 127 (Sup.Ct.1940); In re Martin, 86 N.J. Eq. 265, 273-274, 98 A. 510 (Ch.1916); R. 5:4-1; R. 4:52-1(b); R. 4:67-1. While some cases speak of "notice" as constituting process, in no case have we found a notice akin to the DOD letter that fits within any definition of process. See Stevens v. Associated Mortgage Co. of N.J., 107 N.J. Eq. 297, 152 A. 461 (Ch. 1930); Gondas v. Gondas, 99 N.J. Eq. 473, 134 A. 615 (Ch.1926).
The notice drafted by DYFS was apparently in response to the language in N.J.S.A. 9:6-8.30, which provides in part:
The division when informed that there has been an emergency removal of a child from his home without court order shall make every reasonable effort to communicate immediately with the child's parent or guardian that such emergency removal has been made and the location of the facility to which the child has been taken, and advise the parent or guardian to appear in the appropriate Superior Court, Chancery Division, Family Part on the next court day. The division shall also advise the party making the removal to appear.
This statute requires no particular form of notice and can be complied with verbally *605 or in writing. By regulation the Department of Human Services requires that written notice be given. N.J.A.C. 10:129A-2.7(d). We do not believe this notice falls within the definition of process as intended by the Legislature in N.J.S.A. 2C:13-4. First, under the Title 9 statutes proper use of the DOD letter occurs only after a child is removed from his home and is in the custody of DYFS, the police, a physician, or probation officer. N.J.S.A. 9:6-8.29 and 8.30. A court appearance is anticipated for the next court day. N.J.S.A. 9:6-8.30. These are hardly circumstances where, in the words of the criminal statute, a parent is likely to "take, detain, entice or conceal" a child to evade jurisdiction of the court. N.J.S.A. 2C:13-4a(3). When a DOD letter is properly used the child is no longer within the parent's physical control.
The criminal statute apparently contemplates a situation where the parent has physical custody of the child and then, after being served with process or learning of a pending action, attempts to thwart the court proceeding by preventing access to the child. The criminal statute is not intended to encompass a self-styled agency form which, when properly used, does not even reach the parent until after the child is in custody. The criminal statute certainly does not encompass the misuse of such a form as in the present case.
Here, defendant's child had not been taken into protective custody when the DOD letter was presented to defendant. DYFS was using the letter not to advise of action taken in compliance with N.J.S.A. 9:6-8.29, but rather, to put itself in the position to act under that statute if and when the child was located. Had the babysitter not called the police the child might not have been found, and the direction in the letter that defendant should appear in court on February 28, 2000 would then have been without factual or legal basis.
N.J.S.A. 2C:13-4a(3) provides for an alternative mode of violation. If a person has "actual knowledge of an action affecting the protective services needs of a child pursuant to Title 9... in an action affecting custody" and then commits the prohibited acts, the offense is committed regardless of whether process has been served. We need not determine whether the facts presented to the jury in this case would have supported a conviction on this alternative ground. Once the court incorrectly instructed that the DOD letter was process as a matter of law, the reversible error is not cured by a contention that the jury actually used the alternative basis in finding guilt. Although the jury was instructed that the State had to prove that defendant "acted after being served with process or having actual knowledge of an action affecting the protective services ... needs of a child" the verdict sheet was worded only in terms of service of process. That said, it is highly unlikely that the statute when referring to "actual knowledge of an action" intends to include potential, future actions as well as present pending actions. Again, we note that it was only fortuitous that DYFS located the infant and was able to go forward with an action at all. Had the child not been located we doubt defendant's knowledge of DYFS's future intent would constitute "knowledge of an action" within the meaning of N.J.S.A. 2C:13-4a(3).
The State having failed to prove the essential elements of the crime charged, defendant's conviction must be reversed and a judgment of acquittal entered. We nevertheless address two additional issues which also constitute reversible error. Defendant argues that evidence of her prior bad acts was admitted into evidence in violation of N.J.R.E. 404(h). The evidence *606 in question consisted of references to DYFS's dealings with defendant in relation to defendant's other children. The trial judge had initially ruled, quite properly, that "the prosecutor can't go into any real past history of this defendant with the Division on his direct case. He can give a background for entry of this DOD letter... but her past experience with the Division is probably not relevant and it's certainly highly prejudicial." The court then acknowledged that such evidence might constitute proper rebuttal, but stating "I have to see exactly where the defense goes."
Following this ruling, the attorneys opened to the jury. Defense counsel gave a very brief and, in our view, unremarkable opening statement which the prosecutor interpreted as "opening the door for me to educate the jury as to why DYFS acted in the manner that it did"i.e., the history of the relationship between defendant and DYFS. The trial court agreed and gave the prosecutor permission over defense counsel's objection to go into the history of defendant and DYFS in a "tempered" manner because "it's so prejudicial." Based on this ruling, evidence was presented to the jury that would otherwise have been prohibited.
No reported decision in New Jersey has spoken to the question of whether opening remarks of counsel can "open the door" to rebuttal evidence by the opposing party. The State here urges adoption of a rule allowing such rebuttal testimony. It cites us to numerous out-of-state cases which, in varying factual contexts, have concluded that counsel's opening statement may very well allow an evidential response from the other side. See, e.g., United States v. Chavez, 229 F.3d 946, 952 (10th Cir.2000); United States v. Moore, 98 F.3d 347, 350 (8th Cir.1996); Cole v. Alaska, 754 P.2d 752, 756 (Alaska Ct.App.1988).
Defendant, on the other hand, cites us to those out-of-state decisions which hold that the opening statements of counsel are not evidential and do not call for or justify an evidential response. See, e.g., United States v. Tomaiolo, 249 F.2d 683, 689 (2d Cir.1957); West Virginia v. Richards, 190 W.Va. 299, 438 S.E.2d 331, 335 (1993); Cooper v. Commonwealth of Virginia, 31 Va.App. 643, 525 S.E.2d 72, 75 (2000).
We believe the better approach is that espoused by defendant, particularly in the context of N.J.R.E. 404(b). Our courts have consistently emphasized and attempted to guard against the prejudice that so readily flows from the misuse of "[e]vidence of other crimes, wrongs or acts." Ibid.; State v. Hernandez, 170 N.J. 106, 119, 784 A.2d 1225 (2001); State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992); State v. Ramseur, 106 N.J. 123, 265-266, 524 A.2d 188 (1987), cert. denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); State v. Engel, 249 N.J.Super. 336, 373, 592 A.2d 572 (App.Div.1991), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991). Opening statements are not evidential and should not be responded to by "rebuttal" evidence. If improper remarks are made by counsel, the remedy lies in a curative instruction to the jury or, if absolutely necessary, a mistrial. State v. Hawk, 327 N.J.Super. 276, 281, 743 A.2d 325 (App. Div.2000); State v. Perez, 218 N.J.Super. 478, 486-487, 528 A.2d 56 (App.Div.1987). In our view, an improper or erroneous statement made on opening is not properly corrected by allowing the introduction of prejudicial evidence that would otherwise be inadmissible.
Finally, we address as plain error part of the instructions given to the jury. The statute defendant was charged with violating refers at one point to an "action affecting the protective services needs of a child pursuant to Title 9...." Although a *607 detailed explanation of "protective services needs" was not necessary on the facts as presented, the trial judge instructed as follows:
Protective services needs means when the parents of any minor child or the parent or other person having the actual care and custody of any minor child are grossly immoral or unfit to be entrusted with the care and education of the child or shall neglect to provide the child with proper protection, maintenance and education or they are of such vicious, careless, or dissolute habits as to endanger the welfare of a child or to make the child a public charge or likely to be a public charge, it shall be lawful for any person interested in the welfare of such child to institute an action in Superior Court Chancery Division family part in the county where such minor child is residing for the purpose of having the child brought before the Court and for the further relief provided by this chapter the Court may proceed in an action in summary manner or otherwise.
This portion of the charge was not discussed during the court's charge conference with counsel. The trial judge never said where he found this definition of "protective services needs." It is a term that is undefined in the Code of Criminal Justice and undefined in Title 9. The language used by the trial judge appears almost verbatim in N.J.S.A. 9:2-9, but not as a definition per se of "protective services needs." The Chapter 2 language describes certain parental character or conduct which allows initiation of court action by "any person interested" in the child's welfare. It is not the language used in N.J.S.A. 9:6-8.28 or 8.29, although the terminology in N.J.S.A. 9:2-9 may certainly describe a form of "abuse and neglect" or "imminent danger" as those terms appear in N.J.S.A. 9:6-8.28 and 8.29. In the present case, however, there was no evidence of defendant's deficiencies as a parent other than the infant's "small" weight loss which was completely unexplained, and the improper references to DYFS's prior contacts with defendant. As the trial judge himself said during colloquy with counsel at the end of trial, "I don't know what the danger is in this case." Neither did the jury. We do not understand why the court felt it necessary to define "protective services needs" in such dramatic and emotive terms. The instruction could only have served to imply that defendant was a parent who was "grossly immoral" or of "vicious, careless or dissolute habits," none of which was shown by the evidence. This provocative language was factually unwarranted and legally unnecessary. It was also prejudicial. This language, when combined with the improper admission of evidence about defendant's past dealings with DYFS, took on a synergy that neither error possessed individually. The instruction constituted plain error.
In our view the phrase "protective services needs" as used in N.J.S.A. 2C:13-4 is a general reference to a variety of possible circumstances within the ambit of Title 9 and, if the phrase needs to be defined for the jury, then the definition should be tailored to the particular facts of the case as those facts mesh with the appropriate section of Title 9. We note that regulations promulgated by the Department of Human Services refer to child protective services in a variety of contexts including: investigations or actions under N.J.S.A. 30:4C-11 and 12, N.J.S.A. 9:6-8.11, and N.J.S.A. 9:6-8.21, et seq. See N.J.A.C. 10:129A-2.1, 2.7 and 3.3(a)3; N.J.A.C. 10:133C-2.5(d). The term is also used in the context of child care services, N.J.A.C. 10:15-5.4 and medical services, N.J.A.C. 10:129A-2.4. In N.J.A.C. 10:15-1.2 "child protective services" is defined as follows:
*608 [S]ervices on behalf of any child, under age 19, considered at risk of abuse, neglect, or exploitations; or found to be abused, neglected, exploited or abandoned, as identified by the DYFS. The term, unless otherwise specified, includes services provided to children in out-of-home placements under the supervision of the DYFS.
These regulatory references illustrate the generic nature of the phrase "protective services." Absent a more specific definition in the Criminal Code, we assume the Legislature used the phrase to encompass any of the numerous Title 9 circumstances that permit third-party intervention into the parent/child relationship for the safety and welfare of the child. When a defendant is charged with a violation of N.J.S.A. 2C:13-4a(3), the trial court in fashioning its jury instructions must first decide if the definition of "protective services needs" is in issue. If it is not, then a general reference to actions allowed by statute for the protection, safety or welfare of the child may be all that is necessary. If a more detailed explanation is required, it should be tailored to the specific facts of the case and to the specific statutory authority underpinning "the action affecting the protective services needs." That was obviously not done in the present case.
For the reasons stated, the judgment of conviction is reversed. Because it appears from the record that the State produced all available significant evidence at trial and we find no suggestion that the State has more, we remand for entry of a judgment of acquittal. State v. Baker, 228 N.J.Super. 135, 143, 549 A.2d 62 (App.Div. 1988).
NOTES
[1] N.J.S.A. 9:6-8.29 provides in relevant part:

Emergency removal without court order
a. A police officer or a designated employee of the Probation Division or a designated employee of the division may remove a child from the place where he is residing, or any such person or any physician treating such child may keep a child in his custody without an order pursuant to section 8 of P.L.1974, c. 119 (C.9:6-8.28) and without the consent of the parent or guardian regardless of whether the parent or guardian is absent, if the child is in such condition that his continuance in said place or residence or in the care and custody of the parent or guardian presents an imminent danger to the child's life, safety or health, and there is insufficient time to apply for a court order pursuant to section 8 of P.L.1974, c. 119 (C.9:6-8.28), or any physician or hospital treating such child may keep a child in custody pursuant to P.L.1973, c. 147 (C.9:6-8.16 et seq.). The Division of Youth and Family Services shall not be required to provide reasonable efforts to prevent placement if removal of the child is necessary due to imminent danger to the child's life, safety or health in accordance with section 24 of P.L.1999, c. 53 (C.30:4C-11.2).
The justification for DYFS's decision to utilize this statute is not entirely evident from this record, but in the context of this criminal prosecution there was no need to prove the bona fides of the agency's determination.
[2] This is sometimes transcribed as a "DODD" letter. The acronym was never explained.